**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

ROBERT I. DITMAN,                    )
                                     )
            Plaintiff,               )        **3:12-CV-00080 JWS**
                                     )
      vs.                            )        **ORDER AND OPINION**
                                     )
ALYESKA PIPELINE SERVICE             )
COMPANY,                             )        **[Re: Motion at docket 23]**
                                     )
            Defendant.               )
_____  )

## I.  MOTION PRESENTED

At docket 23, Defendant Alyeska Pipeline Service Company ("Alyeska") filed a

motion for summary judgment.  Plaintiff Robert Ditman ("Ditman") responded at

docket 35.  Alyeska's reply is at docket 36.  Ditman was granted leave to file a rebuttal,

which is at docket 38.  Oral argument was not requested and would not assist the court.

## II.  BACKGROUND

Ditman was employed by Alyeska from January 28, 2002 until February 29,

2012.  Ditman worked with Alyeska's communications team as a technician.  At some

point during Ditman's employment, around 2005 or 2006, Alyeska decided to combine

its communication and instrumentation teams.  Before the merger of the two teams,

-1-

communication technicians and instrumentation technicians had different training requirements and performance checks needed for advancement up to a higher pay level, but once the teams were combined both the communications technicians and the instrumentation technicians would have to meet the progression requirements of the instrumentation team. Additionally, requirements for oversight and leadership experience were added to the progression requirements.[1]

At the time the teams were combined, Ditman was a level IV communications technician and had been since October 20, 2005.[2] He was told by supervisors that he could progress up one level under the existing communications progression requirements, but that he would have to meet the updated instrumentation requirements for any levels after that.[3] About January 22, 2007, Ditman met the necessary communications requirements to be promoted, and he was therefore advanced to a level V instrumentation technician.[4]

In 2008, Ditman approached his supervisors about moving up to a level VI instrumentation technician. The supervisors decided that since he had been a high level communications technician, he could complete a customized set of requirements and performance checks that would suffice to advance him another level. With Ditman's participation, one of the instrumentation supervisors prepared a memorandum setting forth the required performance checks and training requirements needed for

---

[1]Doc. 28 at ¶¶ 2-3; Doc. 27 at ¶ 2.

[2]Doc. 28 at ¶ 4.

[3]Doc. 28 at ¶ 4.

[4]Doc. 28 at ¶ 5.

Ditman to advance.[5]  As part of these requirements, Ditman had to complete a lead technician assignment.[6]  Ditman agreed to these requirements.[7]

Ditman started his lead technician assignment in June of 2009.  Ditman was working in this capacity when an incident of insubordination occurred that led to Ditman's two-week suspension in August of 2009.[8]  The suspension letter stated that he would not be eligible for progression to level VI for a period of one year.[9]  In 2010, when Ditman was again eligible for progression, he had completed his lead technician assignment, but had not completed some of the other requirements that had been set forth in the agreed upon progression memorandum.  When he was asked about completing the performance checks, Ditman indicated that they were not relevant to his advancement and that he should be promoted to the next level.[10]  He was offered a chance to create a new list of performance checks to complete; ones that would be mutually acceptable to Ditman and his supervisors and managers, but he declined.[11]  He was not allowed to progress.  One of his co-workers, Sean Doherty, was allowed to progress to a level VI technician in 2007 after the merger of the communications team with the instrumentation team.[12]  Based on these circumstances, Ditman filed a complaint with the EEOC in March of 2011 regarding his failure to be advanced to a level VI technician.

---

[5]Doc. 27 at ¶¶ 2-3.

[6]Doc. 27 at ¶ 4.

[7]Doc. 27 at ¶ 3; Doc. 31 at pp. 4-5 (deposition pp. 26-30).

[8]Doc. 30, Ex. I.  Ditman was suspended for verbally attacking his supervisor and using profanity during a phone call.

[9]Doc. 30, Ex. I.

[10]Doc. 27 at ¶ 5.

[11]Doc. 27 at ¶ 6.

[12]Doc. 27 at ¶ 7; Doc. 28 at ¶ 6.

In May of 2010, Ditman had his annual medical examination. All Alyeska technicians are required to have such an examination in order to verify that the they can meet various regulatory obligations and be exposed to certain work-related hazards.[13] During Ditman's examination, it was noted that his pulmonary function was significantly reduced as compared to previous years. Alyeska had concerns about his ability to perform certain job tasks and requested more medical history from Ditman.[14] Ditman told Alyeska that he was being treated for a respiratory condition, and he also provided Alyeska with releases so they could review his medical records related to his pulmonary function. In June of 2010, Alyeska received a letter from Ditman's health care provider that indicated Ditman could wear a respirator in an emergency but that Ditman should avoid exposure to smoke, noxious fumes, irritants, and avoid using a protective mask.[15] Based on the letter, Alyeska restricted Ditman from working around any irritants and noxious fumes, which meant he was unable to take on overtime work with the mechanical maintenance department where he would come into contact with solvents and be exposed to fumes.[16] Alyeska's health and safety department cleared him to use a respirator, but noted that more information would be "needed to fully address accommodation questions."[17]

In August of 2010, Alyeska received a follow up letter from Ditman's health care provider stating that Ditman had been examined by a pulmonologist who concluded that Ditman was not at any greater risk from exposure to fumes, smoke, and other irritants

---

[13]Doc. 24, Ex. A.

[14]Doc. 24 at ¶ 3.

[15]Doc. 24, Ex. B.

[16]Doc. 24, Ex. C.

[17]Doc. 24, Ex. C.

and that he could wear a respirator.[18]  A week later, Barb Smith, a nurse who provides

medical case management services to Alyeska, sent a letter to the treating clinic to

clarify Ditman's ability to wear a respirator under exertion.[19]  The clinic responded to

Smith's inquiry on September 10, 2010, indicating that Ditman could work without any

restrictions whatsoever.  Alyeska cleared Ditman from his medical restrictions on

September 21, 2010.[20]

In May of 2011, Alyeska posted job positions for two mechanical maintenance

technicians.  The job posting indicated that Alyeska was looking for candidates with a

minimum of five years of "direct technical work experience in mechanical maintenance

in an industrial facility."[21]  It also indicated that it would prefer candidates with welding

competency, experience with machine shop equipment, certification from an accredited

trade organization or school, and the ability to operate heavy equipment, among other

things.  Over one hundred people applied.[22]  An initial three-member team was

assembled to review the resumes of all candidates and to narrow down the candidates

based on experience.  The three team members reviewed the resumes independently

before meeting to rank the candidates.  Ditman did not make the first cut and was not

hired for the positions.[23]

Around this time, during the summer and fall of 2011, Ditman began having

problems with Alyeska.  He received a verbal disciplinary warning on July 27, 2011,

about staying past normal shift hours without approval, tardiness, and the wording and

---

[18]Doc. 24, Ex. D.

[19]Doc. 24, Ex. E.

[20]Doc. 24 at ¶ 8.

[21]Doc. 25, Ex. B.

[22]Doc. 25 at ¶ 4.

[23]Doc. 25 at ¶¶ 4-5.

tone of his emails and communications to coworkers.[24]  A month later, on August 31, 2011, he received a written warning for inappropriate emails.  The written warning indicated that his emails were disrespectful and violated Alyeska's code of conduct regarding work relationships.  The written warning stated that he had just recently received a verbal warning about his communications with other employees and that his failure to remedy his behavior could result in further disciplinary action, including termination.  It noted that the warning would remain in his file for two years.  Ditman refused to sign the written warning.[25]

Also around this time, one of Ditman's supervisors, Verne Griffis, became concerned that Ditman was under the influence of drugs or alcohol because of his appearance and attendance issues.  He reported the concern to the maintenance manager, Mike Drew, who in turn had Griffis talk to Tom Brady, the Occupational Health Unit Manager.  Griffis told Brady that he was not certain there was a problem but that he had concerns.  Brady recommended that another employee who had drug and alcohol awareness training should observe Ditman.  That employee reported that he did not observe any problem.[26]

In September of 2011, Griffis informed Stacia Motz in human resources about Ditman's attendance issues and asked her to review the gate logs to check when Ditman arrived at the work facility and when he left the work facility.[27]  About two months later, Griffis also asked for the gate logs of two other employees with whom he had attendance issues.[28]  The gate logs summaries for all three employees were

---

[24]Doc. 30 at ¶ 7; Doc. 30, Ex. K; Doc. 27 at ¶ 11.

[25]Doc. 30 at ¶ 8; Doc. 30, Ex. L; Doc. 27 at ¶ 12.

[26]Doc. 26 at ¶¶ 2-3; Doc. 24 at ¶ 11.

[27]Doc. 26 at ¶ 6; Doc. 30 at ¶ 9.

[28]Doc. 26 at ¶ 4; Doc. 30 at ¶ 9.

provided on January 16, 2012.[29] Another one of Ditman's supervisor, Thomas Huhndorf, reviewed Ditman's gate log summary and determined that there was not a problem with Ditman's attendance that needed to be addressed. The other two employees were verbally counseled about their attendance.[30]

Ditman took medical leave in September of 2011 for shoulder surgery. When he returned in late January, his supervisor reported that Ditman was not speaking to him or speaking to him only briefly.[31] Additionally, on January 24, 2012, Ditman's supervisor received a call from Jessica Asire, the security badge coordinator. She told the supervisor that Ditman had come to her office to request a new badge and that Ditman was rude and disgruntled when she told him what he needed to do before receiving a new badge.[32]

On February 15, 2012, Smith, the nurse who provided case management services to Alyeska, received an email from Ditman. The email indicated that he had been distressed since his return to work after shoulder surgery and that he had been referred to a psychiatrist and planned to go to the Alaska Native Medical Center in the morning to see if he could get an appointment.[33] Smith emailed Ditman and stated that he should discuss his issues with Alyeska's behavioral health provider, his doctor, or human resources. She also noted that he should make sure to call in his absences as required and attached FMLA paperwork for him to bring to his doctor.[34] The next day, she forwarded the email to Brady and said that she needed to talk to him about

---

[29]Doc. 30 at ¶ 9; Doc. 30, Ex. M.

[30]Doc. 30 at ¶ 9;

[31]Doc. 26 at ¶ 6.

[32]Doc. 26 at ¶ 5; Doc. 26, Ex. B.

[33]Doc. 29 at ¶ 8; Doc. 29, Ex. A at ALY 00699.

[34]Doc. 29 at ¶ 9; Doc. 29, Ex. A at ALY 00698.

-7-

Ditman's email.[35]  She also called Ditman to follow up on the email.  She took notes during their conversation.[36]  Ditman clarified that his problems were not with his shoulder but with his mental state due to work harassment.  He indicated that he doubted his way of thinking and that he did not deserve the way Alyeska was treating him.  He assured her that he would not hurt himself.  However, Smith states that he said he could not guarantee that he would not hurt other Alyeska employees and that he was in "survival mode."[37]  Ditman denies that he ever made such a statement.  Instead, he asserts that he simply did not answer her question about whether he would hurt someone else.  He does not deny that he told her he did not trust himself.[38]  Smith believed that Ditman presented a potential for workplace violence and reported the call to Alyeska administrators.[39]

On February 23, 2012, a human resources employee with Alyeska called Ditman and informed him that a disciplinary review board ("DRB") was being convened regarding his behavior.  Specifically, he was told that the DRB was reviewing three incidents: 1) his discourteous conduct when requesting a new badge from the security coordinator in late January of 2012; 2) his insubordination to his supervisor in early February of 2012; and 3) his threats of workplace violence during his conversation with Smith on February 21, 2012.   She urged him to prepare and send his position statement regarding those three issues.[40]

---

[35]Doc. 29, Ex. A at ALY 00698.

[36]Doc. 29 at ¶ 10; Doc. 29, Ex. B.

[37]Doc. 29 at ¶ 11; Doc. 29, Ex. B.

[38]Doc. 31 at pp. 13-14 (deposition pp. 189-192).

[39]Doc. 29 at ¶ 13.

[40]Doc. 30 at ¶ 11.

The DRB met on February 28, 2012.   At the time the DRB met, the board members were aware that Ditman had previously filed an EEOC complaint against Alyeska in March of 2011.  The board determined that termination was appropriate and prepared a report.  Termination was based on Ditman's actions of threatened workplace violence, insubordination, and continued violation of Alyeska's Code of Conduct regarding employee interactions.[41]  Ditman received his termination notice on February 29, 2012.  The notice reminded Ditman that he could file an appeal through human resources.[42]  He did not file any appeal, but rather pursued this action in state court.

He amended his complaint in state court to include allegations regarding his termination.[43]  His First Amended Complaint asserts the following claims:

1) Alyeska discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and the Alaska Human Rights Act when it failed to promote him, investigated him for alcohol use and attendance problems, and terminated him.

2) Alyeska discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA") and the Alaska Human Rights Act when it failed to promote him, investigated him for alcohol use and attendance problems, and terminated him.

3) Alyeska discriminated against him on the basis of his disability or perceived disability in violation of the Americans with Disability Act ("ADA") and the Alaska Human Rights Act, by placing him on restricted duty.

---

[41]Doc. 30 at ¶¶ 12-14; Doc. 30, Exs. N, O.

[42]Doc. 30, Ex. O.

[43]Doc. 1-3.

4) Alyeska retaliated against him in violation of Title VII of the Civil Rights Act of 1964, the ADEA, and the Alaska Human Rights Act, because he filed a complaint against Alyeska with the Equal Employment Opportunity Commission ("EEOC").

5) Alyeska breached the covenant of good faith and fair dealing that is implied in all employment contracts in the States of Alaska by all of the foregoing actions, by breaching company policies, and by not treating him the same as similarly situated employees.

6) Alyeska violated the Family Medical Leave Act ("FMLA") by terminating him for statements he made to a nurse while he was being interviewed for FMLA leave.

Alyeska removed the case to federal court in April of 2012. Subsequently, it moved for summary judgment as to all claims in Ditman's First Amended Complaint. Ditman has since filed a Second Amended Complaint to add a claim for Interference of Contract.[44] That claim is not the subject of this motion.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[45] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[46] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[47] In resolving a motion for summary judgment, a court must view the evidence in the light most

---

[44]Doc. 59.

[45]Fed. R. Civ. P. 56(a).

[46]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[47]*Id.*

-10-

favorable to the non-moving party.[48]  The reviewing court may not weigh evidence or assess the credibility of witnesses.[49]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[50]  The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[51]  Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[52]  All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[53]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[54]

## IV.  DISCUSSION

### A. Discrimination Claims

Ditman claims that Alyeska failed to promote him and hire him for a maintenance position, investigated him for alcohol use and attendance problems, and terminated him because of his race in violation of Title VII and the Alaska Human Rights Act and because of his age in violation of the ADEA and the Alaska Human Rights Act.  Alyeska moved for summary judgment, arguing there is no evidence to establish that its actions

---

[48]*Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

[49]*Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[50]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[51]*Id.* at 323-25.

[52]*Anderson,* 477 U.S. at 248-49.

[53]*Id.* at 255.

[54]*Id.* at 248-49.

towards Ditman were based on anything but legitimate, nondiscriminatory reasons. To defeat a motion for summary judgment on both his state and federal employment discrimination claims,[55] the plaintiff must first set forth a prima facie case of discrimination.[56] In order to establish a prima facie case of discrimination, the plaintiff may produce direct evidence of discriminatory intent or, alternatively, he may proceed under the *McDonnell Douglas*[57] framework to present evidence sufficient to create a presumption of discrimination.[58]

To establish a prima facie case of discrimination based on *McDonnell Douglas*, a plaintiff must show: 1) he belongs to a protected class; 2) he was performing according to legitimate expectations; 3) he suffered an adverse employment action; and 4) that the employer treated similarly situated employees who did not belong to the protected class more favorably.[59] The four-factor test is slightly altered in a situation where the plaintiff argues he was not hired or promoted based on discriminatory reasons. In such a case, he must show: 1) he belongs to a protected class; 2) he applied for and was qualified for the position; 3) he was rejected despite his qualifications; and 4) the employer filled the position with an employee who was not part of the protected class or continued to consider other applicants who had comparable qualifications.[60]

---

[55]The Alaska Supreme Court looks to federal law in interpreting Alaska's anti-discrimination laws and endorses the federal approach when analyzing such claims. *Era Aviation, Inc. v. Lindfors,* 17 P.3d 40, 43-44 (Alaska 2000).

[56]*Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2004).

[57]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[58]*Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

[59]*Vasquez,* 349 F.3d at 640 n. 5; *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

[60]*See Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005).

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action.[61] If the employer is successful, the presumption is dropped and "the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination."[62] This burden-shifting approach applies to both Title VII discrimination claims and ADEA claims in the summary judgment context.[63]

Failure to promote

As to the allegation that he was not promoted to a level VI technician because of his race or age, Ditman failed to demonstrate that he was qualified for the promotion. Ditman does not dispute that he did not complete the required performance checks that he needed to advance to a level VI technician. Rather, he merely argues that he should not have had to do so and that he was unfairly denied the opportunity to do so. However, he submits no evidence to support his arguments.[64] While Ditman submitted his prior performance evaluations, which were positive, such evaluations do not address the undisputed fact that there were agreed upon performance checks that he needed to complete in order to advance to a level VI technician and that he did not do so.

---

[61] *Noyes,* 488 F.3d at 1168.

[62] *Id.*; *see also Dominguez-Curry*, 424 F.3d at 1037.

[63] *Shelly v. Geren*, 666 F.3d 599, 607-08 (9th Cir. 2012) (holding that the *McDonnell Douglas* burden-shifting framework is still the appropriate legal framework for deciding ADEA claims on summary judgment).

[64] *See Franklin v. Murphy*, 745 F.2d 1221, 1235 (9th Cir. 1984) (noting that on a summary judgment motion, a pro se plaintiff must present probative evidence tending to support the claim).

<u>Investigation</u>

As for the allegation that Ditman was unfairly singled out for observation because of his drinking and investigated for attendance, there is no evidence that any adverse employment action resulted from the observation of Ditman or from the investigation into Ditman's attendance. Ditman was not terminated for these reasons.

<u>Failure to hire</u>

While not entirely clear from his complaint and briefing, Ditman appears to base his discrimination claims in part on Alyeska's failure to hire him for the mechanical maintenance position. Ditman has not presented admissible evidence to establish that he was qualified for the job. Alyeska required a minimum of five years "direct technical work experience in mechanical maintenance in an industrial facility." Ditman asserts that his resume shows that he worked as an oil response technician for eight years and was therefore qualified. Ditman proceeds at length in his briefing to discuss his mechanical maintenance experience, but he does not submit any admissible evidence or even allege in his briefing that such experience was reflected in his resume or otherwise communicated to the selection panel. On the other hand, the evidence submitted by Alyeska demonstrates that all three members on the initial review panel rejected Ditman's resume, which did not clearly reflect that he held a job in the mechanical maintenance field or that he had direct responsibilities for mechanical maintenance as part of his job duties. One of the panel members submitted an affidavit stating that Ditman's resume did not show enough direct technical work in mechanical maintenance.

<u>Termination</u>

While Ditman argues that his termination was unfair, he failed to present evidence to establish a prima facie case that his termination was in any way motivated by discrimination. That is to say, he failed to present any evidence that younger or non-native employees displaying similar conduct were treated differently. In his briefing, Ditman alleges he had many instances of "egregious" violations that went undisciplined

and that he had questionable behavior before his termination that was not a problem for Alyeska.[65]  He appears to argue that this suggests the presence of unlawful motivations on the part of Alyeska in 2012 when it decided to take disciplinary action against him. Even taking these allegations into account, they do not lend support to Ditman's required prima facie case.  Ditman fails to present evidence that would be admissible at trial to demonstrate that other employees engaged in the type of behavior that led to Ditman's termination were not disciplined.  Ditman was terminated for three specific events, including one incident of threatening workplace violence.  The fact that he may have previously engaged in other inappropriate behavior without discipline is irrelevant. Moreover, Alyeska presents evidence that at least two other employees were terminated after threatening the safety of Alyeska employees, supporting its argument that similarly situated employees were treated the same.

Pretext

Even if Ditman were to establish a prima facie case of discrimination, Alyeska has met its burden of demonstrating a legitimate, nondiscriminatory reason for its actions in relation to Ditman.  As discussed above, based on the undisputed evidence submitted by Alyeska, Ditman did not meet the agreed upon performance checks necessary to advance to a level VI technician and did not meet the requirements for the mechanical maintenance position.  In regard to Ditman's termination, Alyeska has presented evidence to show that Ditman was fired for specific instances of misconduct and that Ditman had received both verbal warnings about his behavior and a written warning about his behavior before being terminated.

Given Alyeska's demonstrated non-discriminatory reasons for its actions, the presumption of discrimination drops away, and the burden shifts to Ditman to show that Alyeska's stated reasons are merely pretext for intentional discrimination.  Ditman "can show pretext directly, by showing that discrimination more likely motivated the

---

[65]Doc. 35 at pp. 18-25.

employer, or indirectly, by showing that the employer's explanation is unworthy of credence."[66] An explanation is unworthy of credence if it is internally inconsistent or otherwise unbelievable.[67]

In his briefing Ditman argues that Alyeska's stated reason for not advancing him up a pay level is not believable because his co-worker, Sean Doherty, was allowed to advance to a level VI position. Indeed, "[a] plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated [non-members of the protected class] but similarly situated employees more favorably than the plaintiff."[68] In his briefing, Ditman argues that Doherty was similarly situated because they were both communication technicians with the same job responsibilities and alternated shifts. It is true that both Doherty and Ditman were communications technicians before the merger of the communication and instrumentation teams. However, at the time the teams were combined, around 2006, Doherty was at a higher level than Ditman: Doherty had been a level V technician at that time and had been at that level since February of 2004, whereas Ditman was at a level IV technician and had been since October of 2005.[69] Shortly after the merger of the two teams, in the beginning of 2007, both Ditman and Doherty were allowed to advance one level: Ditman was elevated to a level V technician and Doherty was elevated to a level VI technician.[70] Thus, they were treated similarly at the time of the merger when they became instrumentation technicians.

Around a year and a half after Doherty had been promoted to a level VI instrumentation technician, Ditman requested similar advancement. His supervisors established, with Ditman's involvement and approval, a set of performance checks and

[66]*Vasquez*, 349 F.3d at 641.

[67]*Noyes*, 488 F.3d at 1170.

[68]*Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011).

[69]Doc. 28 at ¶ 4.

[70]Doc. 28 at ¶¶ 6-7.

the training Ditman needed to complete to be qualified to move up to a level VI technician. He never completed those requirements. Ditman argues that, putting the requirements aside, he was more qualified to be a level VI technician than Doherty. Alyeska presented evidence to demonstrate that at the time of Doherty's advancement, he had completed the required overhaul and leadership assignments necessary to be a level VI technician and that his supervisors believed that he had the necessary experience and ability to move up to level VI instrumentation technician.[71] Ditman does not present any evidence that would be admissible at trial to counter Alyeska's evidence that Doherty was qualified to move up to a level VI technician in 2007. He only alleges in his briefing that Doherty had drug and health problems that made him unreliable. Again, these are mere allegations without any evidentiary support. Referencing his positive evaluations and mentioning instances of his good work, Ditman also argues that he was more qualified to be a level VI technician than Doherty. "[A]n employee's subjective personal judgments of [his] own competence alone do not raise a genuine issue of material fact."[72]

Ditman also states in his briefing that Alyeska's stated reasons for his termination are not believable because it did not consistently apply its policies. He argues in his brief that his conduct has historically been questionable and that there have been other instances of "egregious" misconduct that went unaddressed.[73] The court finds his argument—that he could have been fired sooner suggests some improper motive on the part of Alyeska when it ultimately took disciplinary action in 2012—unconvincing and insufficient to create an inference of discriminatory pretext. He also states in his brief that Doherty was often impaired at work but never disciplined. However, Ditman was not terminated for substance abuse. He fails to present evidence

[71]Doc. 28 at ¶ 6; Doc. 27 at ¶ 8.

[72]*Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996).

[73]Doc. 35 at pp. 18-25.

-17-

to demonstrate that other employees who engaged in behavior similar to that which led up to Ditman's termination were not disciplined or were disciplined more favorably.

The record shows that Alyeska followed its policies with respect to Ditman's termination and that Ditman had a recent history of disrespectful communications with supervisors and co-workers, including a suspension in 2009 for verbally harassing his supervisor in a profanity-laced phone call regarding perceived unfairness in overtime assignments. Indeed, Ditman admits that he had a history of disrespectful or inappropriate communications with his coworkers. Moreover, as noted above, Alyeska's evidence demonstrates that at least two other employees were terminated after threatening the safety of Alyeska employees.

To the extent Ditman argues that his termination was wrongful because he did not say that he could not guarantee the safety of other employees, such a disputed fact is irrelevant. The question is whether the employer honestly believed its reason for terminating Ditman, even if it turns out to be misinformed.[74] The evidence supports a finding that Alyeska believed Smith's report and believed that Ditman threatened the safety of other employees.

Ditman does not point to any other evidence to suggest a discriminatory motive behind his failure to be promoted and his termination. There is nothing in the record from which the court could infer that Alyeska discriminated against Ditman because he was Native Alaskan or above 40 years old. It is clear from Ditman's briefing that he believes that he was singled out and treated unfairly during his last few years of employment with Alyeska. However, those general allegations of unfairness are not enough to withstand summary judgment as to his discrimination claims.

---

[74]*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (finding that the employer based termination on legitimate, nondiscriminatory reasons where the employee attacked the credibility of witnesses, but the employer honestly believed its reason for termination).

**B. Disability Discrimination**

Ditman's ADA claim asserts that Alyeska regarded him as having pulmonary disease and would not allow him to perform overtime work with the mechanical maintenance department based on this perceived disability.[75] As with claims of race or age discrimination, the court evaluates disability discrimination using the same burden-shifting framework discussed above.[76] Plaintiff must first set forth a prima facie case of disability discrimination.[77] To establish a prima facie case of disability discrimination, the plaintiff must show that he 1) has a disability or is perceived as having a disability; (2) is qualified—meaning he is able to perform the essential functions of the job with or without accommodation; and (3) suffered an adverse employment decision because of the disability.[78] If he does so, the burden shifts to the defendant to provide a non-discriminatory reason for the adverse employment action.[79] If successful, the plaintiff must show that the defendant's reason was pre-textual.[80]

Here, Ditman failed to demonstrate that he was qualified for the overtime work or that Alyeska unlawfully restricted his ability to work in the mechanical maintenance department. The evidence shows that Alyeska had concerns about Ditman's pulmonary function based on the results of his annual company physical, calling into

---

[75]Ditman's complaint also states that Alyeska may have denied him overtime opportunities because they perceived him to be an alcoholic, but he presents no evidence to connect the restrictions placed on him in 2010 to drinking concerns. All the evidence shows that the restrictions came about because of his reduced pulmonary function.

[76]*See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-52 (2003) (applying the *McDonnell Douglas* standard to an ADA claim on summary judgment);

[77]*Id.* at 49 n.3; *Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 843 (Alaska 2010) (requiring a prima facie showing of discrimination in a disability discrimination claim under Alaska state law).

[78]*Nunes v. Wal-mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999); *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1087 (9th Cir. 2001).

[79]*Raytheon*, 540 U.S. at 49 n.3.

[80]*Id.*

question his ability to wear a respirator which was needed to perform the type of work Ditman would do in the mechanical maintenance department as part of his overtime assignments.  Ditman fails to point to evidence calling into question the results of these test results.  Alyeska worked with Ditman to obtain more information about his medical condition to determine whether he could wear a respirator when needed and whether Ditman's overtime work in the mechanical maintenance department would be safe for him.

In late June of 2010, Alyeska received information from Ditman's health care provider that indicated Ditman should avoid working in environments where there could be exposure to certain irritants.  Ditman does not point to any evidence that could refute this conclusion.  Based on this information, Alyeska determined that he could not safely perform the tasks he had been performing during his overtime assignments because those tasks involved coming into contact with solvents and fumes.  It also determined that he could work with a respirator as needed, but that more specific information would be needed regarding this accommodation.  It then communicated with Ditman's healthcare provider to get clarification regarding Ditman's ability to wear a respirator.

To the extent Ditman argues that Alyeska delayed giving him full clearance to work with a respirator and irritants after receiving information that he was not physically limited from doing so, the court concludes that this was not an adverse employment action.  On August 23, 2010, Ditman's doctor cleared him to work around irritants and with a respirator.  One week later, a nurse working for Alyeska wrote the doctor to clarify that Ditman could wear a respirator even when under exertion.  Once the doctor responded, all restrictions were lifted.  Alyeska was working with Ditman and his health care providers to make sure Ditman was capable of safely performing certain job functions.

**C. Retaliation**

Ditman claims that Alyeska retaliated against him by terminating him after he filed an EEOC claim in violation of Title VII, the ADEA, and the Alaska Human Rights

Act. Both federal and Alaska law require that Ditman set forth a prima facie case of retaliation to withstand summary judgment.[81] "To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action."[82] "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [his] protected activity was likely the reason for the adverse action."[83]

The only evidence Ditman cites to demonstrate causation is timing, noting that he was fired after he filed his EEOC complaint. While "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity," the lapse of time between the adverse action and the protected activity must be fairly short.[84] Here, Ditman filed his EEOC claim on March 1, 2011. Termination proceedings were not initiated until late February of 2012. A one-year interval between a complaint and the adverse employment action, standing alone, does not raise an inference of discrimination.[85] Ditman argues that we should not count the time in 2011 between his complaint and his termination when he was on FMLA leave, but he provides no precedential support for this argument.

Moreover, even assuming Ditman established a prima facie case, the burden shifting analysis discussed in the previous section applies.[86] For the same reasons

---

[81] *Cornwell* 439 F.3d at 1035; *Smith*, 240 P.3d at 841 n.23.

[82] *Cornwell*, 439 F.3d at 1035.

[83] *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982); *Villiarimo,* 281 F.3d at 1065.

[84] *Villiarimo*, 281 F.3d at 1065.

[85] *Cornwell*, 439 F.3d at 1035 (holding that an eight-month gap between the plaintiff's complaint and his demotion was too great to support an inference of causation in a retaliation claim).

[86] *Villiarimo*, 281 F.3d at 1064.

-21-

discussed above, Alyeska had legitimate reasons for terminating Ditman, and Ditman has failed to show that these reasons were merely pre-textual.

**D. FMLA**

Ditman argues that Alyeska interfered with his exercise of his FMLA rights in violation of 29 U.S.C. § 2615(a)(1) when it relied upon statements he made to a nurse for purposes of obtaining FMLA leave as a basis for his termination. Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise any [FMLA rights]."[87] To establish a claim for FMLA interference, the plaintiff must establish that he took FMLA-protected leave; that he suffered an adverse employment action; and that the adverse action was causally related to his FMLA leave.[88]

Ditman's claim that Alyeska interfered with his exercise of his FMLA rights by using information provided to a nurse in securing leave as a basis for termination is not supported by any supporting case law. Indeed, this court was unable to find a case that suggests an employer violates FMLA in such a situation. It is undisputed that Ditman told Smith he did not trust himself and that at a minimum he failed to assure Smith that he would not hurt other Alyeska employees. Those communications created a threat to safety which are not protected simply because the context in which they were made was FMLA-related.[89]

---

[87] 29 U.S.C. § 2615(a)(1).

[88] *Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 146 (9th Cir. 2004); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001). In *Bachelder*, the Ninth Circuit held that the appropriate legal framework for analyzing FMLA interference claims is not the traditional burden-shifting approach but rather is just the application of a standard derived from the applicable statute and regulations. *Id.* at 1124-25.

[89] *Cf. Denny v. Union Pac. R. Co.*, 173 Fed. Appx. 549, 551 (9th Cir. 2006) ("[I]nsubordination and fighting words are not protected merely because the underlying subject is protected.").

To the extent Ditman argues that he was terminated because he took FMLA-protected leave, he has failed to point to any evidence to show that his termination was causally connected to such leave. As discussed above, Alyeska has established a legitimate reason for Ditman's termination that is not connected to Ditman's FMLA leave. While the court recognizes the temporal proximity between Ditman's return from FMLA leave and his termination, Ditman does not argue that this proximity suggests he was fired for taking medical leave or that this proximity alone would be enough to show the requisite causation. Indeed, Ditman appears to believe that his termination was based on the fact that his supervisors were unfair to him and singled him out starting in 2011 because of his race or age or because he filed an EEOC complaint in March. Moreover, while temporal proximity alone can suffice as circumstantial evidence of causation in some FMLA cases, the court concludes "that no reasonable jury could find causation in this case given the uncontroverted evidence recited above, even considering the timing of [Ditman's] termination."[90]

## E. Good Faith and Fair Dealing

Ditman also brings a state law claim against Alyeska for the breach of the covenant of good faith and fair dealing. Employment contracts in Alaska include an implied covenant of good faith and fair dealing.[91] "'The covenant has both a subjective and an objective component.'"[92] An employer violates the subjective component and is in breach of the covenant when it acts with an improper motive, such as when it "discharges an employee for the purpose of depriving him or her of one of the benefits

---

[90]*Buckman v. MCI World Com*, No. CV-06-2005, 2008 WL 928000, at *6 n. 7 (D. Ariz. April 4, 2008); *cf. Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) (noting that the length of time between a protected activity and an adverse employment action should not be considered "without regard to its factual setting").

[91]*Smith v. Dep't of Transp.*, 253 P.3d 1233, 1238 (Alaska 2011).

[92]*Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 844 (Alaska 2010) (quoting *Mitchell v. Teck Cominco Alaska, Inc.,* 193 P.3d 751, 760 (Alaska 2008)).

of the contract."[93]  The employee cannot rely on his personal feelings about the employer's motive, but rather he must present evidence that the employer's decision to terminate was in bad faith.[94]

Ditman failed to present evidence raising a genuine issue of material fact about Alyeska's subjective motive for its actions.  As the foregoing sections describe, the evidence shows that Alyeska terminated Ditman because of behavioral issues, including a threat of workplace violence, not for improper subjective motives such as depriving him of an employee benefit.  Moreover, Ditman was not entitled by contract to be promoted, to work overtime, or to retain his job when he violated work policies.

An employer violates the objective component if it treats an employee in a manner that a reasonable person would deem unfair.[95]  It is objectively unfair, and a breach of the covenant of good faith and fair dealing, to treat similarly situated employees differently or to terminate an employee for unconstitutional reasons or for reasons that violate public policy.[96]  It is also objectively unfair to terminate an employee without proper or fair procedures.[97]

Ditman failed to present evidence raising a genuine issue of material fact as to the objective fairness of his termination.  "Although the question of what a reasonable person would find to be unfair is usually a question for the trier of fact, this does not relieve [Ditman] of the burden of presenting admissible evidence to successfully oppose a motion for summary judgment."[98]  As discussed above, Ditman did not point to any

---

[93] *Smith*, 240 P.3d at 844.

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Holland v. Union Oil Co. of Cal., Inc.,* 993 P.2d 1026, 1032 (Alaska 1999).

[98] *Smith*, 240 P.3d at 845.

-24-

evidence to show that Alyeska terminated him for discriminatory reasons or for other objectively unfair and unlawful reasons, and there is no evidence that Alyeska treated Ditman differently from other employees similarly situated. To the extent Ditman argues that his termination was unfair because he did not say, as Smith reported, that he could not guarantee he would not harm other Alyeska employees, the evidence shows that Alyeska's DRB determined in good faith that the misconduct occurred.[99] It considered Ditman's denial, but found Smith's notes and reports credible. The evidence shows that Ditman's termination was consistent with Alyeska's employment policies. Indeed, Ditman does not argue that there were procedural discrepancies or that he was fired without proper procedures.

## V. CONCLUSION

Based on the preceding discussion, Alyeska's motion for summary judgment is granted as to Ditman's First through Sixth Causes of Action in his Second Amended Complaint. His Seventh Claim was not included in this motion and, therefore, is the sole remaining claim.

DATED this 21st day of April 2014.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

[99]*Peterson v. State*, 236 P.3d 355, 369 (Alaska 2010) (noting that if an employer makes a determination of misconduct in good faith, there is no breach even if the employee can prove that the determination was erroneous).