# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

ROBERT I. DITMAN,

    Plaintiff,

vs.

ALYESKA PIPELINE SERVICE COMPANY,

    Defendant.

3:12-CV-00080 JWS

ORDER AND OPINION

[Re: Motions at docket 65, 70 & 85]

## I. MOTION PRESENTED

At docket 65 Plaintiff Robert Ditman ("Plaintiff" or "Ditman") filed a motion for summary judgment regarding his interference with contract claim. At docket 69, Defendant Alyeska Pipeline Service Company ("Defendant" or "Alyeska") filed a response. Plaintiff replied at docket 79 and filed a supplemental reply at docket 83. At docket 70, Defendant filed its motion for summary judgment as to Ditman's interference with contract claim. Plaintiff responded at docket 84. Defendant replied at docket 93. Oral argument was not requested and would not assist the court.

This order also disposes of Ditman's motion for temporary restraining order at docket 85.

## II. BACKGROUND

Ditman was employed by Alyeska starting in January of 2002. He worked as a technician until he was terminated in February of 2012 based on Ditman's

-1-

insubordination, his continued violation of Alyeska's Code of Conduct regarding employee interactions, and his threat of workplace violence.[1] Ditman received his termination notice on February 29, 2012. Shortly thereafter, Alyeska placed a security hold on Ditman, preventing him from accessing Alyeska property, including the right-of-way for the Trans-Alaska Pipeline System ("TAPS").[2] The conditions for restoring his access privileges included a workplace/violence anger management assessment. The duration of his security hold was for one year upon completion of the anger management assessment or for three years without completion of the assessment.[3]

Ditman pursued an action against Alyeska for employment discrimination in state court. His First Amended Complaint[4] asserted the following claims:

1) Alyeska discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and the Alaska Human Rights Act when it failed to promote him, investigated him for alcohol use and attendance problems, and terminated him.

2) Alyeska discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA") and the Alaska Human Rights Act when it failed to promote him, investigated him for alcohol use and attendance problems, and terminated him.

3) Alyeska discriminated against him on the basis of his disability or perceived disability in violation of the Americans with Disability Act ("ADA") and the Alaska Human Rights Act, by placing him on restricted duty.

---

[1] See the court's order at docket 68, which granted summary judgment in favor of Defendant as to Plaintiff's employment claims.

[2] Doc. 75 at ¶ 5; Doc. 74 at ¶ 2.

[3] Doc. 75 at ¶ 5.

[4] Doc. 1-3.

-2-

Case 3:12-cv-00080-JWS   Document 105   Filed 07/11/14   Page 2 of 11

4) Alyeska retaliated against him in violation of Title VII of the Civil Rights Act of 1964, the ADEA, and the Alaska Human Rights Act, because he filed a complaint against Alyeska with the Equal Employment Opportunity Commission ("EEOC").

5) Alyeska breached the covenant of good faith and fair dealing that is implied in all employment contracts in the State of Alaska by all of the foregoing actions, by breaching company policies, and by not treating him the same as similarly situated employees.

6) Alyeska violated the Family Medical Leave Act ("FMLA") by terminating him for statements he made to a nurse while he was being interviewed for FMLA leave.

Alyeska removed the case to federal court in April of 2012. Subsequently, it moved for summary judgment as to all claims in Ditman's First Amended Complaint. The court granted the motion.[5] The court's order, however, did not dispose of the action because while Alyeska's motion for summary judgment as to the First Amended Complaint was pending, Ditman filed a Second Amended Complaint, adding a state claim for interference with contract that was not addressed in the summary judgment motion.[6]

Ditman's interference with contract claim is based on Alyeska's enforcement of Ditman's security hold on February 7, 2014, when Ditman traveled on the TAPS right-of-way to access an electrical substation, Substation PS 11, as part of his new job with the Copper Valley Electric Association ("CVEA"), an independent service provider whose employees are allowed within the TAPS right-of-way based on Alyeska's non-objection but subject to security controls.[7] As part of his new job with the CVEA, Ditman needed access to certain electrical substations— Meals Substation, Solomon

---

[5] Doc. 68

[6] Doc. 59.

[7] Doc. 76 at ¶ 6.

-3-

Gulch Hydroelectric Dam Valve House, Heidenview Substation, and Substation PS11.[8] To access these substations, CVEA employees must travel on the TAPS right-of-way.[9] Prior to February 7, 2014, security personnel at the TAPS right-of-way access points let Ditman access those substations because his name was on CVEA's employee list.[10] On February 7, 2014, Ditman drove through Alyeska's controlled access point in order to access Substation PS 11 without checking in with security. He believed that his co-worker, who was driving in a separate car ahead of him, had already checked in with security.[11] Security confronted Ditman to verify his status and then realized, after conducting an official TAP's security screen, that Ditman was on a security hold and could not be on Alyeska property. After some verbal exchange, Ditman left the property. Ditman called Alyeska security operations manager, Michael Craig, that day to inquire about the security hold. Ditman does not dispute that he used excessive profanity during that call and verbally threatened Alyeska employees.[12] Craig attempted to contact Ditman's supervisor at the CVEA to discuss Ditman's access issues but was unable to reach the supervisor.[13] Over the course of the next few days, Ditman threatened various Alyeska employees. He blocked the car of Ruby Morales, the wife of Alyeska employee Andres Morales, and made a profane gesture. He called Alyeska employee, Mike Drew, and proceeded to swear at him and threaten to kill him. He called Alyeska's security center numerous times, leaving threatening messages and

---

[8]Doc. 59 at ¶ 52.

[9]Doc. 76 at ¶ 6.

[10]Doc. 75 at ¶ 6.

[11]Doc. 59 at ¶ 57.

[12]Doc. 75 at ¶ 10. Ditman disputes that he threatened to prevent Craig's son from getting a job with the CVEA, but he otherwise does not dispute that he made profanity-laced threats. Doc. 79 at ¶ 14.

[13]Doc. 75 at ¶ 9.

-4-

Case 3:12-cv-00080-JWS   Document 105   Filed 07/11/14   Page 4 of 11

1  using excessive profanity.  He also left four threatening messages on Andres Morales's
2  cell phone.  All of the above events were reported to Valdez police, and Ditman has
3  been criminally charged with harassment based on these actions.[14]
4  After these events, Alyeska decided not to work out an arrangement with the
5  CVEA so that Ditman could have limited access for work purposes.  Rather, they
6  decided to keep the security hold in place.[15]  Ditman subsequently lost his job with the
7  CVEA because he could not access the TAPS right-of -way.  Ditman alleges that
8  Alyeska's actions amount to an interference with his employment contract in violation of
9  state law.  Both Ditman and Alyeska now request summary judgment on that claim.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[17]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[18]  In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[19]  The reviewing court may not weigh evidence or assess the credibility of witnesses.[20]

---

[14]Doc. 74 at ¶¶ 8,9; Doc. 41 at ¶¶ 4,5; Doc. 42 at ¶ 4; Doc. 70-1.

[15]Doc. 74 at ¶¶ 7,9.

[16]Fed. R. Civ. P. 56(a).

[17]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[18]*Id.*

[19]*Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

[20]*Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005).

-5-

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[21] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[22] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[23] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[24] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[25]

## IV. DISCUSSION

Ditman's interference with contract claim alleges that Alyeska wrongly interfered with his employment contract with the CVEA.

> To sustain an interference claim, a plaintiff must show that "(1) a contract existed, (2) the defendant ... knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified."[26]

Here, summary judgment in favor of Alyeska is warranted because there is no evidence that Alyeska intentionally induced the CVEA's termination of Ditman or that it engaged in any wrongful conduct. Alyeska presents evidence to show that it, as agent for the companies that own the TAPS, can control access to the right-of-way and that they had

---

[21]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[22]*Id.* at 323-25.

[23]*Anderson,* 477 U.S. at 248-49.

[24]*Id.* at 255.

[25]*Id.* at 248-49.

[26]*Briggs v. Newton*, 984 P.2d 1113, 1119 (Alaska 1999) (quoting *RAN Corp. v. Hudesman*, 823 P.2d 646, 648 (Alaska 1991)).

-6-

legitimate reasons to place Ditman on a security hold, preventing him from accessing Alyeska property.[27] While Ditman devotes much of his briefing to discussing why Alyeska cannot control his access to the TAPS right-of-way, he fails to present any evidence to support his argument. Ditman relies on certain provisions of the agreements that govern the TAPS right-of-way. The agreements upon which he relies discuss access roads that lead to the TAPS right-of-way and provide that Alyeska cannot prohibit access to these access roads unless given permission to do so by the appropriate government officer.[28] Ditman argues that based on these access road provisions Alyeska cannot lawfully limit his access. However, Ditman's interference claim does not involve access roads. Rather, the claim involves Ditman's ability to travel on the right-of-way itself so he can work at the electrical substations named in the complaint. It is clear from the evidence presented that access to the TAPS right-of-way is restricted unless the applicable government entity specifically grants access to someone and Alyeska does not object.[29]

Ditman argues that before February 7, 2014, Alyeska allowed him access to the TAPS right-of-way for work purposes. Ditman seems to suggest that Alyeska's failure to enforce its security hold prior to February 7, 2014, is evidence from which a jury could infer that Alyeska's sudden enforcement of the security hold was motivated by the desire to see him fired from his new job. Alyeska does not dispute that Ditman was allowed on the TAPS right-of-way on various occasions after his termination but before February of 2014, but it argues and presents evidence to show that the contract

---

[27]Doc. 76 at ¶ 7; Doc. 94-1 at p. 2 (Stipulation 1.12.4).

[28]Stipulation 1.12.1 states: "[After construction], Permittees/Lessees shall permit free and unrestricted public access to and upon access roads, except with the written consent of the [appropriate government officer]." Doc. 94-1 at p. 2; Doc. 94-3 at p. 4; Doc. 94-4 at p. 4.

[29]Doc. 76 at ¶ 4, 7, 8. Stipulation 1.12.4 states: "After construction of the pipeline, and with the concurrence of Permittees/Lessees, the [appropriate government officer] may designate areas of the right of way to which the public shall have free and unrestricted access." Doc. 94-1 at p. 2; Doc. 94-3 at p. 4; Doc. 94-4 at p. 4.

security agents allowing Ditman onto the TAPS right-of-way did not follow Alyeska's security screening protocol. Rather than check the TAPS security system, the agents simply relied on the CVEA's list of approved employees.[30] Once Alyeska security officials and management became aware of the fact that Ditman was regularly accessing its property in contravention of the security hold, they took action to have him removed and contacted Ditman's CVEA supervisor to discuss. Ditman disputes Alyeska's evidence in his briefing, arguing that he knows security protocols and that Alyeska's security officers and management knew he had a security hold but let him onto the right-of-way anyway.[31] He nonetheless fails to present evidence to support his argument. His allegations are not sufficient evidence.[32] Ditman also argues that the CVEA followed security protocol,[33] but even assuming Ditman has the personal knowledge to testify as to that fact, it nonetheless does not rebut Alyeska's evidence that the contract security guards for Alyeska did not properly screen CVEA employees before admitting them into the right-of-way. The undisputed evidence demonstrates that Alyeska's enforcement of Ditman's security hold was not intended to get Ditman fired, but rather to make its property secure. Indeed, Alyeska presents evidence to show that it did not ask or tell the CVEA to fire Ditman and that management was initially considering working with the CVEA to find a solution until Ditman's harassing conduct after February 7, 2014 put such a compromise off the table.[34]

It is undisputed that after Ditman's termination and through July of 2013 Ditman had permission to cross over the TAPS right-of-way to access his mining claim. However, that access was limited to a very specific location and did not include the

---

[30] Doc. 75 at ¶ 6.

[31] Doc. 83 at ¶ 5.

[32] *See Anderson,* 477 U.S. at 248-49.

[33] Doc. 83 at ¶ 5.

[34] Doc. 74 at ¶ 7; Doc. 74 at ¶¶ 10-12.

-8-

ability to travel and remain within the right of way itself. This evidence is not sufficient for a reasonable juror to find that Alyeska's conduct on February 7, 2014 in enforcing the security hold was motivated by the desire to have Ditman fired from his new job or to otherwise find intentional and wrongful conduct on the part of Alyeska.[35]

Ditman also appears to suggest that Alyeska's failure to enforce the security hold prior to February 7, 2014 acts as a waiver of its right to exclude him or a concession that they could not exclude him in the first place. The argument is not supported by any evidence which would establish the elements of waiver.

Even if Alyeska intentionally and wrongfully interfered with Ditman's employement contract, its interference may be justified if its conduct was motivated by a desire to protect its economic interests. In *RAN Corp. v. Hudesman*,[36] the Alaska Supreme Court recognized the right of a landlord to interfere with his tenant's lease assignment contract. It based its decision on the fact that the landlord, the interferring party, had a "direct financial interest" in the contract at issue.[37] The court explained that "'the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective.'"[38]

Alyeska clearly has a legitimate financial interest in protecting the TAPS, its other facilities, and its employees from threats and harm. Alyeska's evidence show that Ditman has a history of threatening Alyeska employees; he was terminated for insubordinate behavior and for threatening workplace violence and, moreover, after Alyeska enforced the security hold on February 7, 2014, Ditman continued to engage in

---

[35]*See Anderson*, 477 U.S. at 256 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

[36]823 P.2d 646 (Alaska 1991).

[37]*Id.* at 649.

[38]*Id.* (quoting *Bendix v. Adams*, 610 P.2d 24, 30 (Alaska 1980)).

threatening behavior. While Ditman asserts that he never had any intention to harass or threaten employees,[39] he does not dispute that he made the threatening, profance phone calls and engaged in the threatening behavior described above. Indeed, Ditman continues to hurl threats at Alyeska. In his briefing, he says that he does not engage in any harm to the pipeline itself but he nonetheless threatens such harm: "If they do not smartin [sic] up; I will consider digging up the pipeline. I actually own the mineral rights on a portion of the [TAPS right-of-way]."[40] Therefore, Alyeska's enforcement of its security hold on Ditman, even though it may interfere with his ability to work at the CVEA, is justified; it protects Alyeska's property and the employees who work on such property and there is no evidence from which a juror could conclude that Alyeska's enforcement of that hold was taken out of spite or malice.

## V. MOTION AT DOCKET 85

At docket 85, Ditman moved for a restraining order requiring Alyeska to afford him access to the TAPS right-of-way and to preclude Alyeska from interfering with his job at CVEA. The motion was referred to Magistrate Judge Oravec and has been briefed. This court's decision on the motions at docket 65 and 70 renders the motion at docket 85 untenable. The reference to the magistrate judge is withdrawn.

## VI. CONCLUSION AND DIRECTION FOR ENTRY OF JUDGMENT

Based on the foregoing discussion, Defendant's motion at docket 70 for summary judgment on the remaining interference with contract claim is GRANTED and Plaintiff's motion at docket 65 for summary judgment is DENIED. Plaintiff's motion for a restraining order at docket 85 is DENIED.

The court granted Ditman's motion to amend his complaint again in an order at docket 104. The order required Ditman to serve and file his complaint no later than July

---

[39]Doc. 84 at ¶ 5.

[40]Doc. 79 at ¶ 19.

-10-

2, 2014. He did not do so. The Clerk of Court is directed to enter judgment in favor of Defendant and to close this file.

This court will NOT entertain any further motions from Plaintiff. Ditman's only recourse at this point is an appeal to the United States Court of Appeals for the Ninth Circuit.

DATED this 11th day of July 2014.

/S/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE